UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ANDREW PROSSIN and,                    :
4367625 NOVA SCOTIA LIMITED, dba       :
EXPEDITION EXPERIENCE,                 :
     Plaintiffs,                     :
                                :
     v.                              :          C.A. No. 23-167MRD
                                :
INTERNATIONAL ASSOCIATION OF           :
ANTARCTICA TOUR OPERATORS, et al.,     :
     Defendants.                     :
_____:

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

     Now pending before the Court is the motion of Plaintiffs Andrew Prossin and 4367625 Nova Scotia Limited dba The Expedition Experience ("EE"), both citizens of Canada, for leave to file a second amended complaint ("SAC") against Defendants International Association of Antarctica Tour Operators ("IAATO"), Robin Woodhead and Janeen Haase; Cheeseman's Ecology Safaris and Ted Cheeseman; and Ship to Shore, Inc. and Lorraine Betts.[1]  ECF No. 65. As with earlier iterations of the pleading [complaint (ECF No. 1) and first amended complaint (ECF No. 10)], the SAC rests principally on the denial by IAATO, a not-for-profit trade association whose members are alleged to include 95% of the tour operators that compete in the highly competitive worldwide market of selling tours to Antarctica, of Plaintiffs' 2022 application for IAATO membership.  The SAC also amounts to a supplemental pleading in that it

---

[1] Defendants are all citizens of various states in the United States, except Defendant Woodhead, who is a citizen of South Africa.  Dropped from the case by the SAC are Defendants Aurora Expeditions, an Australian entity, Tomas Holik, an Argentinian individual, Antarpply Expeditions, an Argentinian entity, and a now-deceased Argentinian individual, Ute Hohn-Bowen, ECF No. 61.  Once the motion to amend is granted in part as I recommend, the individuals and entities dropped by the SAC will no longer be named defendants in the case.

adds a post-first-amended complaint event – the denial of Plaintiffs' 2025 IAATO application. ECF No. 65-2 ¶¶ 98-100.

This motion to amend follows the Court's rejection of much of Plaintiffs' first amended complaint, including all antitrust allegations pursuant to the Sherman Act (15 U.S.C. §§ 1-2) for failing to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).[2]  Prossin v. Int'l Ass'n of Antarctica Tour Operators, C.A. No. 23-167 WES, 2024 WL 3850360 (D.R.I. Aug. 16, 2024).  In Prossin, the Court focused on Plaintiffs' factual and conclusory allegations to determine whether they afforded adequate support for the antitrust claims and, guided by the now familiar Twombly/Iqbal[3] standard, found that these allegations failed plausibly to plead an injury "redressable through antitrust enforcement."  Id. at *2-4.  The Court noted that Plaintiffs may move to amend but took no position "at this time on whether such a motion will be granted."  Id. at *5.  Plaintiffs now ask for leave of Court pursuant to Fed. R. Civ. P. 15(a)[4] to allow them to amend and (effectively[5]) to supplement pursuant to Fed. R. Civ. P. 15(d) by restating the antitrust claims with additional facts to cure the deficiencies identified by the Court in Prossin.

---

[2] In addition to the antitrust allegations, Prossin also dismissed Plaintiffs' claim of tortious interference with contract and the defamation counts against Defendants IAATO, Woodhead and Haase (leaving intact defamation claims against other defendants).  2024 WL 3850360, at *4-5.  At the hearing before me, Plaintiffs clarified that, despite the wording of the SAC, their motion to amend was not intended to challenge either the dismissal of the claim of tortious interference with contract or the dismissal of the defamation claims against Defendants IAATO, Woodhead and Haase, while continuing to assert defamation claims against Defendants Cheeseman, Cheeseman's Ecological Safari, Ship to Shore, Inc. and Betts.  Nor have Plaintiffs sought to controvert Defendants' argument that these previously dismissed claims are still futile.  See ECF No. 71 at 17 (except for antitrust claims, Plaintiffs' intent is to conform to Court's previous decision).  During the hearing, Plaintiff's counsel advised that I should recommend that the motion to amend be denied to the extent that the SAC purports to restate these previously dismissed claims because Plaintiffs have abandoned them.  That is what I have done.

[3] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

[4] This motion was filed within the time for amendment pursuant to the parties' agreed-on pretrial schedule, ECF No. 64, and the Court did not set a deadline for amendment of the pleadings.  Therefore, Rule 16(a) of the Federal Rules of Civil Procedure is not implicated.

[5] Plaintiffs do not purport to rely on Fed. R. Civ. P. 15(d).  However, Plaintiffs' addition to their antitrust allegations of the 2025 denial of IAATO membership is clearly a supplementation to add events that occurred after the date of the pleading to be supplemented.

Defendants counter that the SAC's new antitrust claims – Count 1 (abuse of monopoly power in violation of § 2 of the Sherman Act) and Count 2 (group boycott in violation of § 1 of the Sherman Act) – are still fatally flawed because, despite the new content, they fail plausibly to allege antitrust injury.

The motion to amend has been referred to me. Because I conclude that Counts 1 and 2 are still futile, which (if my recommendation is adopted) is dispositive of Plaintiffs' antitrust claims, I am addressing the motion by report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). See Summer Infant (USA), Inc. v. Tomy Int'l, Inc., No. 1:17-cv-549-MSM-PAS, 2020 WL 4437259, at *1 (D.R.I. Aug. 3, 2020) (magistrate judge's denial of motion to amend pleading is subject to de novo review when it is dispositive of claim). Also pending and referred to me are Defendants' motions to exclude the Prossin Declaration. ECF Nos. 72, 73. These motions are denied for the reasons stated infra in a separate Text Order.

## I.    Standard of Review

Rule 15(a) provides that courts should freely give leave to amend a pleading "when justice so requires," absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and/or] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962). The standard for Fed. R. Civ. P. 15(d) is "closely analogous" in that the determination is committed to the discretion of the district court. United States ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 6-7 (1st Cir. 2015). Thus, the Court may deny a motion to amend/supplement where the amendment/supplementation is futile. Id. The standard for "futility" in these circumstances is whether the complaint as amended would survive

a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Ferreira v. City of Pawtucket, 365 F. Supp. 2d 215, 216 (D.R.I. 2004).

        To be viable pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to state a claim that is plausible; the plausibility inquiry requires the Court to distinguish factual allegations (which must be accepted as true) from conclusory allegations (which need not be credited).  Silva v. Rhode Island, C.A. No. 19-568JJM, 2020 WL 5258639, at *2 (D.R.I. Sept. 1, 2020), adopted by text order (D.R.I. Sept. 16, 2020).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  When determining whether a complaint satisfies the plausibility standard, the Court must assume the truth of all well-pleaded facts and "give the plaintiff the benefit of all reasonable inferences."  Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007).  This presumption does not extend to bare legal conclusions.  Iqbal, 556 U.S. at 678.  If the well-pleaded facts offer only an inference of liability but cannot reach the level of supporting a plausible claim, the Court must dismiss the complaint.  See id. at 679.  As the Supreme Court has emphasized, scrupulous adherence to this standard is particularly important in antitrust cases because of the cost of antitrust discovery.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007).  That is, before launching such an antitrust claim into the crushingly expensive discovery/expert phases, the Court must examine whether the pleading's claim of injury is supported by facts sufficient plausibly to allege each substantive element of the alleged Sherman Act violation.

        When considering a Fed. R. Civ. P. 12(b)(6) motion, "[o]rdinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion [to dismiss] is converted into one for summary judgment."  Jefferson v. Bank

of Am., N.A., C.A. No. 19-126 WES, 2020 WL 620247, at *2 (D.R.I. Feb. 10, 2020) (internal

quotation marks omitted).  There are exceptions to this proposition, including for "documents the

authenticity of which are not disputed by the parties[,]" which may be considered.  Alt. Energy,

Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (internal quotation marks

omitted).  Thus, when a complaint's factual allegations are expressly linked to and admittedly

dependent upon a document, the authenticity of which is not challenged, the court can review it

on a motion to dismiss.  Id.

## II.    Facts Not Alleged in SAC

With their motion to amend, Plaintiffs appropriately filed the SAC as the proposed

pleading.  ECF No. 65-2.  However, as the motion to amend has been briefed and argued before

the Court, parties on both sides have proffered additional facts not included in the SAC for

consideration in connection with the Court's futility analysis.  The Court's approach to each is

summarized below.

First, Defendants IAATO, Woodhead and Haase attached to their opposition

memorandum two documents, which they represent to be IAATO's written responses

respectively to Plaintiffs' 2022 and 2025 IAATO membership applications.  ECF Nos. 66-1, 66-

2.  Each document explains that Plaintiffs' applications were denied because they lacked

materially vital/essential information.  ECF Nos. 66-1, 66-2.  As to the 2022 IAATO application,

the attached letter advised Plaintiffs that the application appeared to be based on the defunct

operations of Plaintiff EE's predecessor, a bankrupt entity (One Ocean Expedition, "One Ocean")

that had been an IAATO member, and that the application was premature in that the current

applicant, Plaintiff EE, was still developing its organizational structure (including that it did not

even have a chief executive officer); the letter urged Plaintiffs to reapply for Provisional

Operator membership in 2023.  ECF No. 66-1; see ECF No. 65-2 ¶ 37.  As to the 2025

application, the attached email advised Plaintiffs that the application was not only untimely but

also was missing essential information including the names of the vessel, ship management

company and bridge staff with Antarctic experience, as well as public facing information about

Antarctica voyages; the email encouraged Plaintiffs to reapply after at least one season of

Antarctica expedition experience.  ECF No. 66-2.  These documents link to SAC's factual

allegations that Plaintiffs' 2022 and 2025 IAATO's applications were denied.

      Plaintiffs have disputed neither the authenticity nor the relevancy of these two documents

and have not asked that they be excluded from the Court's consideration.  Rather, citing Steward

Health Care Sys., LLC v. Blue Cross & Blue Shield, 997 F. Supp. 2d 142 (D.R.I. 2014),

Plaintiffs contend that IAATO's stated business justification for the 2022 and 2025 denial

decisions as articulated in the letter and email should not be accepted as true.  Id. at 152 ("[T]he

existence of a business justification is not properly determined on a motion to dismiss.").  Based

on the foregoing (particularly in light of Plaintiffs' acquiescence), I find that this letter and email

appear to fall within the narrow band of material outside of the pleading that may be considered

in connection with a Fed. R. Civ. P. 12(b)(6) motion to dismiss because they are expressly linked

to the pleading's factual allegations and their authenticity is not challenged.  See Alt. Energy,

Inc., 267 F.3d at 33.  Thus, the Court may consider that Defendant IAATO provided Plaintiffs

with these two documents stating a business justification for the 2022 and 2025 denial decisions.

However, at the motion to dismiss phase, the Court must also accept as true Plaintiffs' allegations

that these reasons are pretextual and therefore may not, and I do not, determine that the two

documents state the true justification.

Second, in their Reply to Defendants' opposition to their motion to amend, Plaintiffs addressed Defendants' argument that the SAC's new iteration of the antitrust claims is futile with a proffer of additional facts in the Prossin Declaration.  ECF No. 71-1.  Defendants argue correctly that these new facts should be excluded from the Court's Fed. R. Civ. P. 12(b)(6) consideration because (unlike the two IAATO documents) the Declaration is outside the narrow band of material dehors the four corners of the pleading that may be considered at this phase of the case.  ECF Nos. 72, 73.  However, practicality suggests that the more efficient course is for the Court to afford the additional facts proffered by Plaintiffs in the Prossin Declaration limited consideration solely to the extent of examining whether they would "nudg[e]" the claim "across the line from conceivable to plausible," Twombly, 550 U.S. at 570, if they were incorporated into a Third Amended Complaint.  See Jackson v. Boeing Co., No. C21-654 MJP, 2022 WL 16835836, at *6 (W.D. Wash. Nov. 9, 2022) ("even if the Court considers this new allegation outside of the Amended Complaint, it does not save [plaintiff's] claims."); Yagoozon, Inc. v. Kids Fly Safe, No. CA 14-040-ML, 2014 WL 3109797, at *10 n.9 (D.R.I. July 8, 2014) (even if court looked beyond pleadings to affidavit it would not save plaintiff's claim).

Based on the foregoing, the motions to exclude the Prossin Declaration are denied by separate Text Order and the facts contained in them are given limited consideration to determine whether the Court should grant leave to amend to add the Prossin Declaration facts to the pleading.

## III.    SAC's Failure to Plead the Sherman Act Element Required by Foreign Trade Antitrust Improvements Act

During the hearing on the motion to amend, noting that Plaintiffs are foreign nationals (citizens of Canada), ECF No. 65-2 ¶¶ 10, 11, as were almost half of the defendants named in the first amended complaint, n.1 *supra*, and that the alleged relevant market is "worldwide

Antarctica tour business," id. ¶ 33, the Court raised, *sua sponte*,[6] the potential jurisdictional failure of the SAC to allege that the challenged conduct has a "direct, substantial, and reasonably foreseeable effect" on United States domestic or import commerce and that this effect gives rise to Plaintiffs' antitrust injury, as required by the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA").  See Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 423 (5th Cir. 2001) (allegation of antitrust injury in worldwide market asserted by foreign-based subsidiaries for injuries allegedly sustained on foreign platforms triggers FTAIA analysis).  FTAIA rests on the premise that American antitrust laws "strive to maintain competition in our domestic markets" and excludes from the scope of the Sherman Act "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations."  WhaleCo Inc. v. Shein Tech. LLC, Civil Action No. 23-3706 (TJK), 2025 WL 2801861, at *17 (D.D.C. Sept. 30, 2025) (emphasis added) (internal quotation marks omitted).  Thus, FTAIA brings such conduct back within the Sherman Act's reach only if two conditions are met: (1) the alleged conduct must have a direct, substantial and reasonably foreseeable effect on United States domestic commerce, and (2) that domestic effect gives rise to the plaintiff's antitrust injury.  Id.  (internal quotation marks omitted) (alterations in original).

Questioning whether FTAIA's limitation is jurisdictional, as cases in some Circuits have held, as well as whether FTAIA adds a substantive element that the SAC fails to address, the Court ordered supplemental briefing.  Based on the parties' supplemental submissions, I find that

---

[6] Plaintiffs argue that the Court should not rule on the SAC's admitted FTAIA deficiency because the Court raised the problem *sua sponte.*  ECF No. 79.  In support of this argument, Plaintiffs cite Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55, 65 (2d Cir. 1988), which holds that a court errs if it dismisses an antitrust complaint on grounds not briefed by either party.  However, in this case the FTAIA issue has been thoroughly briefed by the parties, including that Plaintiffs were afforded the right to file the opening brief and to respond to Defendants' arguments.  See ECF Nos. 79, 83.  Therefore, I find that the Court may consider the SAC's FTAIA deficiency.

Plaintiffs are right that the more persuasive authority[7] establishes that FTAIA is not jurisdictional. Rather, these cases establish that FTAIA creates an additional substantive element that must be affirmatively pleaded in the circumstance here – two foreign nationals alleging conduct impacting a worldwide market yet seeking to invoke the protection of the Sherman Act in this Court.

In their FTAIA reply brief, Plaintiffs concede not only that FTAIA adds an essential element that must be pleaded in support of their Sherman Act claims, but also that the SAC is materially deficient because it lacks facts to plausibly establish a direct, substantial and reasonably foreseeable effect on United States domestic commerce that gave/gives rise to Plaintiff's alleged antitrust injury. ECF No. 83 at 5. Plaintiffs argue that they can readily cure this deficiency by filing a third amended complaint that adds the conclusory allegation that Defendants' conduct had and continues to have "direct, substantial, and reasonably foreseeable effect" on United States domestic commerce, and that the domestic effect "gives rise" to Plaintiff's antitrust injury. 15 U.S.C. § 6a. As facts to render such an allegation plausible,

---

[7] The First Circuit has not weighed in on the issue. But see McBee v. Delica Co. Ltd., 417 F.3d 107, 117 (1st Cir. 2005) (citing, in dicta, United Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 945-51 (7th Cir. 2003) (en banc) (whether the Sherman Act applied extraterritorially under FTAIA went to subject matter jurisdiction of court), overruled by Minn-Chem, Inc. v. Agrium, 683 F.3d 845 (7th Cir. 2012)). The Circuit cases I find to be more persuasive are: United States v. Hui Hsiung, 778 F.3d 738, 753 (9th Cir. 2015) ("The FTAIA does not limit the power of the federal courts; rather, it provides substantive elements under the Sherman Act in cases involving nonimport trade with foreign nations."); Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 398 (2d Cir. 2014) ("[T]he requirements of the FTAIA are substantive and nonjurisdictional in nature."); Minn-Chem, Inc. v. Agrium Inc., 683 F.3d at 852 ("The Supreme Court's decision in Morrison [v. National Australia Bank Ltd., 561 U.S. 247 (2010)], we believe, provides all the guidance we need to conclude that . . . the FTAIA sets forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts."); Animal Sci. Prods., Inc. v. China Minmetals Corp., 654 F.3d 462, 468-69 (3d Cir. 2011) ("The FTAIA neither speaks in jurisdictional terms nor refers in any way to the jurisdiction of the district courts.") (overruling circuit precedent that "construed the FTAIA as imposing a jurisdictional limitation on the application of the Sherman Act") (citing Boyd v. AWB Ltd., 544 F. Supp. 2d 236, 243 n.6 (S.D.N.Y. 2008)). Less persuasive are the older cases that treat FTAIA as jurisdictional: Empagran S.A. v. F. Hoffmann-LaRoche, Ltd., 417 F.3d 1267, 1269, 1271 (D.C. Cir. 2005); Den Norske Stats Oljeselskap As, 241 F.3d at 425-28.

Plaintiffs represent that they could allege in a third amended complaint that all Defendants[8] are American, that most if not all of the conduct in issue occurred in the United States,[9] and that Plaintiff EE has lost sales and/or projected sales to American consumers sufficient to show the requisite impact on competition in the United States. ECF No. 83 at 5-6. Based on this proffer, Plaintiffs request a renewed opportunity to amend if the SAC's FTAIA deficiency is material to the outcome of the pending motion.[10] Because, based on the analysis that follows, I find that the SAC fails plausibly to allege antitrust injury without regard to the effect on United States commerce, I do not recommend that the Court afford Plaintiffs a third opportunity to amend in an attempt to fill the FTAIA lacuna.

## IV.    Factual Background[11]

As alleged in the earlier pleading[12] and reiterated in the SAC, the relevant market is the highly competitive worldwide Antarctica tour business. ECF No. 65-2 ¶¶ 27, 33. Tour operators from all over the world compete in this market to offer the same end-product – access to Antarctica – with competition based, *inter alia,* on the reliability, safety and comfort of the vessel and its service during travel. Id. ¶¶ 27, 33.

Like the earlier pleading, the SAC alleges that IAATO is a Rhode Island not-for-profit trade association founded in 1991 to advocate and promote the practice of safe and

---

[8] This is not true as to the defendants currently named in the SAC in that Defendant Woodhead is not a citizen of the United States.

[9] The SAC alleges that the 2022 IAATO annual meeting was held in Rhode Island. ECF No. 65-2 ¶ 42. No venue is named for the 2025 IAATO denial decision or for the decisions of various persons and entities to refuse to deal with Plaintiffs (for example, the decision of an entity alleged to be an IAATO member called Polar Latitudes to refuse to charter ships to EE).

[10] I express no view regarding whether such facts would be sufficient to plausibly support the FTAIA element of Plaintiffs' Sherman Act claims.

[11] This background is based on the facts assumed to be true as alleged in the SAC and the Prossin Declaration.

[12] References to the "earlier pleading" are to the first amended complaint (ECF No. 10).

environmentally responsible private-sector travel in the Antarctic.  Id. ¶¶ 12, 28.  IAATO is

dedicated to the environmental well-being of Antarctica.  Id. ¶ 29.  IAATO manages the

scheduling of passenger landings at locations in Antarctica, as well as access to South Georgia

Island, which is "preconditioned upon membership in IAATO."[13]  Id. ¶¶ 28, 31.  IAATO's "seal

of approval" is a strong appeal for an attractive and safe choice for a voyage to Antarctica.  Id. ¶

29.  As a result, at least 95% of Antarctica tour service companies are members of IAATO.  Id. ¶¶

60-61.  Membership in IAATO affords a "highly-valued competitive edge for competing touring

services" in the relevant worldwide Antarctica touring market.  Id. ¶¶ 3, 28.  New to the SAC is

the allegation that IAATO is controlled by its members and has the power to admit or reject new

members.  Id. ¶ 62.  In a conclusory allegation, the SAC also adds the assertion that "IAATO has

. . . achieved a monopoly in the relevant market."[14]  Id. ¶ 103.

Both the earlier pleading and the SAC allege that, for many years, Plaintiff Prossin, an

individual who is a citizen and resident of Canada, operated One Ocean, a "successful" vessel

touring business selling tours primarily to Antarctica.  ECF No. 65-2 ¶¶ 10, 34-35.  One Ocean

competed in the highly competitive worldwide Antarctica tour business and was a member of

IAATO.  Id. ¶ 37.  At some point between 2018 and 2022 (the SAC does not specify when), One

Ocean became bankrupt because the Russian Federation unlawfully took control of two of its

---

[13] The SAC does not contain any factual allegations regarding how or why access to South Georgia Island is restricted to IAATO members or regarding how or why the scheduling of passenger landings at specific locations is managed by IAATO, although during the hearing, Plaintiffs conceded that IAATO does not own South Georgia Island.  Mindful of the SAC's allegation that IAATO leaders have stated that it is like a "shadow government" for Antarctica, ECF No. 65-2 ¶ 96, during the hearing the Court questioned Plaintiffs whether the treaty of nations pertaining to Antarctica (which, as Plaintiffs agree, is not a sovereign nation or under the control of a single sovereign) addresses access to certain areas or impacts IAATO's role in Antarctica.  Plaintiffs did not respond to these questions.

[14] With no allegations describing competition in the alleged relevant market, the SAC's allegation of monopoly power does not distinguish between the level of the market in which IAATO competes, in contrast to the level of the market in which tour operators compete.

vessels depriving it of tour income.  Id. ¶¶ 38-41.  As a result, One Ocean no longer operates as an Antarctica tour service company.  Id. ¶ 39.  After One Ocean ceased operations and went out of business, other IAATO members "worked to take" over the critical relationships that once directed customers to One Ocean and other Antarctica tour operators hired One Ocean's well-qualified former staff.  Id. ¶¶ 85-91.  As the reorganization of One Ocean was winding up, Plaintiff Prossin formed Plaintiff EE, a Canadian corporation, to offer vessel-based tours; this effort has been successful in that Plaintiff EE is profitable and has a "growing sale of tours." ECF No. 65-2 ¶¶ 11, 40-41.

The earlier pleading and the SAC both allege that, in January 2022, Plaintiff EE applied for membership in IAATO with an application based in part on Plaintiff Prossin's experience in operating the bankrupt entity, One Ocean.  Id. ¶ 41.  At the IAATO annual meeting held on April 24-27, 2022, in Newport, Rhode Island, Plaintiff EE's application was "blocked" based on a series of false statements that were used by IAATO presiding officials as a pretext to deny Plaintiffs' application.  Id. ¶ 42.  The false statements were made by representatives of various IAATO members, most of which compete with Plaintiff EE in the highly competitive worldwide Antarctica tour business.  Id. ¶¶ 45-49.  This incident was "unprecedented in recent IAATO history."  Id. ¶¶ 51-52; see id. ¶¶ 27, 33.

As described in the earlier pleading and the SAC, the false statements allegedly made at the April 2022 IAATO meeting were personal attacks on Plaintiff Prossin, including that he stole money, was dishonest, lied, had a history of bankruptcy and running from debt and was arrogant with an ego that "know[s] no bounds."  ECF No. 65-2 ¶¶ 45-49.  Defendant Betts is quoted in the SAC as saying:

> I implore members to vote against this application and we simply must not let this man go back to Antarctica or back into this organization.

ECF No. 65-2 ¶ 48.  The Prossin Declaration adds the additional fact that a member of the IAATO membership committee stated that "the elephant in the room" associated with Plaintiff EE's IAATO application was "Andrew Prossin."  ECF 71-1 ¶ 11.  Consistent with these statements, the SAC adds the allegation that Plaintiffs have been told that IAATO and some IAATO members do not want Plaintiffs in the Antarctica travel business.  Id. ¶¶ 93-94.  In conclusory allegations in both the earlier pleading and the SAC, Plaintiffs claim that these false statements were made pursuant to an agreement by the other Defendants with IAATO to provide a pretext to prevent EE from becoming an IAATO member with the intent of preventing Plaintiffs from competing on an equal footing with those Defendants who are members of IAATO and compete in the business of selling vessel-based tours of Antarctica.  Id. ¶¶ 50, 53, 112.

Most of the new allegations in the SAC are clustered in Count 1 (illegal use of monopoly power in violation of § 2 of the Sherman Act).  ECF No. 65-2 ¶¶ 61-106.  It adds the allegations that 95% of ice-capable cruise ships are owned and controlled by IAATO members, id. ¶ 74, and, pleaded on information and belief, that "IAATO directed all companies chartering ice-capable expedition cruise vessels who are IAATO members not to charter ships" to EE after the April 2022 IAATO meeting.  Id. ¶¶ 72, 75.  More specifically, the SAC alleges that one IAATO member ("Polar Latitudes," not joined as a Defendant) declined to charter a ship to EE, as well as that the individual representing Polar Latitudes told Plaintiffs that members of the IAATO executive committee had agreed that IAATO members should not do business with Plaintiffs.  Id. ¶ 76.  EE also complains that it has been unable to reestablish the relationships (with travel agencies, referral sources and former employees) One Ocean had lost due to its bankruptcy, including that travel companies that used to deal with One Ocean refused to communicate with

13

Plaintiffs.  Id. ¶¶ 83-92.  Similarly, Plaintiffs allege that the false information about Plaintiffs spread by IAATO discouraged ship brokers and ship sellers from doing business with Plaintiffs. Id. ¶¶ 79-81.  Plaintiff EE alleges that it had planned to but was "blocked" from offering a "unique small ship experience" to customers in this highly competitive market, in contrast to two IAATO members (HHX and Aurora[15]), both of which carry passengers on larger ships and both of which opposed Plaintiffs' IAATO applications.  Id. ¶¶ 27, 47, 68-69, 99, 105-06.

To supplement the earlier pleading, the SAC adds the allegation that, in 2025, Plaintiffs applied again for IAATO membership, again competitors of Plaintiff EE expressed objections and again Plaintiff EE was rejected "without justification," causing Plaintiff EE to lose an investor poised to provide financing.  Id. ¶¶ 97-102.  The Prossin Declaration injects the additional facts that Plaintiffs were told that Plaintiff EE's 2025 application was rejected as incomplete because Plaintiff EE had no staff, crew or ship, yet IAATO had no rules requiring that staff and crew be hired and a ship be in place at the time of application.  ECF No. 71-1 ¶¶ 7-10. The Declaration also alleges that other tour companies – less qualified and less experienced than Plaintiff Prossin – were admitted as members of IAATO in 2025.  Id. ¶ 6.

Finally, the SAC adds the following conclusory allegations: (1) by excluding Plaintiff EE from the competitive advantages of IAATO membership, IAATO's conduct has decreased the number of tour operators travelling to Antarctica, thereby increasing price and decreasing choices for consumers, ECF No. 65-2 ¶¶ 63, 69-70, 78, 81; and (2) IAATO has wrongfully used its monopoly power to economically injure Plaintiffs by excluding Plaintiff EE from the

---

[15] Neither of these two competitors is named as a defendant in the SAC.  ECF No. 65-2 ¶ 106.  One – Aurora Expeditions – was alleged to be Australian in the first amended complaint; it has been dropped by the SAC.  ECF No. 10 ¶ 17.  As to the other (HHX Hurtigruten Expeditions), it was not named as a defendant in either the earlier pleading or in the SAC; therefore, its nationality/citizenship is not alleged.

marketplace and reducing options for people seeking high-quality, safe adventure travel to Antarctica. Id. ¶¶ 104-05.

## V.     Substantive Antitrust Law – Sherman Act[16]

In Count 1, Plaintiffs allege that IAATO and its members monopolize the highly competitive worldwide Antarctica tour market and have wrongfully used this monopoly power to sustain their monopoly making it difficult for Plaintiffs to compete with them in violation of § 2 of the Sherman Act by collectively barring Plaintiffs from membership in IAATO and directing "a number of companies" not to do business with Plaintiff EE, including not to charter ice-capable vessels. See generally ECF No. 65-2 ¶ 72. To sustain a Sherman Act § 2 claim, a plaintiff must demonstrate the defendant's (1) "possession of monopoly power in the relevant market" and (2) "willful acquisition, [use] or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). Monopoly power is "the power to control prices or exclude competition." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956). "The existence of such power ordinarily may be inferred from the predominant share of the market." Grinnell Corp., 384 U.S. at 571.

In Count 2, Plaintiffs allege that IAATO's denial of Plaintiffs' 2022 and 2025 IAATO membership applications and the refusal of persons and companies to deal with Plaintiffs constitutes a "group boycott" to exclude/deter Plaintiffs from competing on the same footing in the worldwide Antarctica tour market in violation of § 1 of the Sherman Act. ECF No. 65-2 at

---

[16] This exposition of applicable law is not focused on Plaintiffs' contention during the hearing that the Court should ignore antitrust cases involving large entities because the Sherman Act somehow applies differently when invoked to protect small entities. I do not adopt that principle. To the contrary, as interpreted in the pertinent case law, the Sherman Act protects any and all competition in the United States, whether among large entities or small; that proposition has been my lodestar.

20.  Section 1 of the Sherman Act renders illegal any unreasonable "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations"; a "[g]roup boycott" is a "concerted refusal[ ] by traders to deal with other traders." Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 208 n.1, 212 (1959).  The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.  PLS.Com, LLC v. Nat'l Ass'n of Realtors, 32 F.4th 824, 834-35, 840 (9th Cir. 2022).

While a restraint like price fixing is considered *per se* unreasonable because it "always or almost always tend[s] to restrict competition and decrease output," for most other restraints, courts apply the "rule of reason" by evaluating market power and market structure to assess actual effect on competition.  Ohio v. Am. Express Co., 585 U.S. 529, 540-41 (2018).  While older cases analyzed group boycott cases as *per se* Sherman Act § 1 violations, more recent boycott precedent cautions that the "rhetoric of older group boycott cases cannot be taken at face value, and that any *per se* group boycott label is minimally useful." Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 815 F.3d 43, 62 (1st Cir. 2016) (internal quotation marks omitted).  This is particularly true for a group boycott claim based on the conduct of a trade association despite membership comprised of entities that are competitors.  See Int'l Test and Balance, Inc. v. Associated Air and Balance Council, 14 F. Supp. 2d 1033, 1046 (N.D. Ill. 1998) (legitimate and beneficial function of trade associations includes establishment and monitoring of trade standards).  That is, the procompetitive benefits resulting from trade association activities such as standard setting and product quality assessment "has led most lower courts to apply rule-of-reason analysis" to such activities.  Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 501 (1988); see

Consolidated Metal Prods., Inc. v. Am. Petroleum Institute, 846 F.2d 284, 292 (5th Cir. 1988) (trade association that evaluates products and issues quality opinions without coercing others to follow its recommendations does not commit *per se* Sherman Act § 1 violation). Particularly when the very existence of an economic activity (such as safe tourist access to the harsh, dangerous and fragile environment of Antarctica) requires the sellers in the market to form trade associations and agree to cooperate with one another to a certain extent, the antitrust laws do not condemn such agreements. Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council, 857 F.2d 55, 72 (2d Cir. 1988).

Whether brought under § 1 or 2 of the Sherman Act, to have standing to bring an antitrust claim, a plaintiff must show an injury that is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Sterling Merch., Inc. v. Nestle, S.A., 656 F.3d 112, 121 (1st Cir. 2011) (internal quotation marks omitted). Antitrust injury must be a "consumer injury" stemming from "reduce[d] outputs or raise[d] prices to consumers." Prossin, 2024 WL 3850630, at *3 (internal quotation marks omitted) (alternations in original). It is a fundamental axiom of antitrust law that the Sherman Act protects "competition, not competitors." Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) (internal quotation marks omitted). Because the purpose of the Sherman Act is to "promot[e] . . . consumer welfare," GTE Sylvania Inc. v. Cont'l T.V., Inc., 537 F.2d 980, 1003 (9th Cir. 1976), only when harm to a competitor also harms competition (which, in turn, harms consumers), should the antitrust laws engage to prevent/deter such conduct. An individual competitor's lost profits or economic injury therefore are of "no concern of the antitrust laws." Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc., 412 F. Supp. 3d 941, 956 (N.D. Ill. 2019) (internal quotation marks omitted). It is a "natural part of a competitive market that . . .

firms . . . fail." Consolidated Metal Prods., Inc. v. American Petroleum Institute, 846 F.2d 284, 293 (5th Cir. 1988).

It is well settled that the Sherman Act is not intended to encompass tortious conduct that injures a competitor but does not cause market-wide adverse competitive effect "of the type the antitrust laws were intended to prevent." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); see Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1364 (Fed. Cir. 1999) ("The federal antitrust laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.") (internal quotation marks omitted). Nor are the antitrust laws a "panacea[] for all business affronts which seem to fit nowhere else." ECOS Elecs. Corp. v. Underwriters Laboratories, 743 F.2d 498, 501 (7th Cir. 1984) (internal quotation marks omitted). "[S]ome antitrust cases are intrinsically hopeless because they merely dress up in antitrust garb what is, at best, a business tort or contract violation." Am. Steel Erectors, Inc., 815 F.3d at 70 (internal quotation marks omitted) (alteration in original). Antitrust claims in such cases are properly dismissed. Id. at 70-72.

## VI.    Analysis and Recommendation

As alleged in this case, a Canadian tour operator (Plaintiff Prossin) who had been successfully competing as an IAATO member in the highly competitive worldwide Antarctica tour business, lost two of his ships (as the SAC alleges, not due to his fault) and took his company, One Ocean, into bankruptcy and reorganization. Before the reorganization of the defunct One Ocean concluded, Plaintiff Prossin had formed his new company, Plaintiff EE, which has been successfully competing in the tour business generally. See ECF No. 65-2 ¶ 40.

However, with One Ocean's failure in the background, Plaintiff EE has struggled to reenter[17] the worldwide market of tour companies taking tourists to the harsh and environmentally fragile continent of Antarctica.  In the SAC, Plaintiffs protest that they have been rebuffed in their attempts to rejoin IAATO, the trade association formed not only to protect the fragile environment of Antarctica but also to provide a seal of approval that a tour operator can provide consumers with a safe and comfortable voyage to, in and from its harsh climes.  Plaintiffs also complain of and seek to blame Defendants for Plaintiffs' struggle to recover the resources critical to an Antarctica tour operator that were lost when One Ocean lost two of its ships and failed, including Antarctica-experienced employees, referral sources and ice-capable ships that were redeployed by other operators.  At its essence, the SAC is based on serious economic damage to Plaintiffs caused by their exclusion from the competitive advantages of IAATO membership.  To transmute this economic injury into antitrust injury, the SAC relies on nothing more than the proposition that harm to Plaintiff EE adversely affects competition because this highly competitive market has lost Plaintiff EE as an active (or effective) competitor.  This is not enough to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss.

As the Court found in <u>Prossin</u>, while Plaintiffs' earlier pleading may plausibly have alleged claims based on defamation and tortious interference that, due to personal animus against Plaintiff Prossin, his competitors made false statements and otherwise spoke against doing business with him or Plaintiff EE as a result of which it has been more difficult for Plaintiffs to compete effectively, it was utterly devoid of facts that plausibly establish injury to <u>competition</u> based either on increased prices or reduced output.  <u>See</u> <u>generally</u> <u>Prossin</u>, 2024 WL 3850360, at *2-5.  Despite new facts, the SAC still fails to plug this hole – at most it adds the conclusory

---

[17] The SAC does not reveal whether and to what extent Plaintiff EE has sold or attempted to sell tours to Antarctica.

allegation of reduced output resting solely on the factual contention that Plaintiff EE has been blocked from offering consumers a "small ship experience."  ECF No. 65-2 ¶ 106.  This fact is insufficient because the SAC contains nothing to permit the inference that other competitors in this highly competitive market cannot, and do not, offer consumers that option.

Diving deeper, the SAC's allegation that One Ocean's resources were quickly redeployed for use in the market by other competitors (and therefore were no longer available to Plaintiff EE once it was formed) is evidence of the dynamic seen in a competitive market, not one clogged by the abuse of monopoly power.  Thus, the market failure of One Ocean did not leave a vacuum or reduction in competitive activity as the employees, travel agents and other resources One Ocean had needed to operate were swiftly absorbed by other competitors.  Further, as described in the SAC, the defamatory statements resulting in IAATO's denial of Plaintiffs' reentry into membership after One Ocean's failure amounted to a unique ("unprecedented") event; and, as averred in the Prossin Declaration, other tour operators were admitted in the same period.  That is, accepting the SAC and Prossin Declaration facts as true, the alleged wrongful conduct was targeted at the elimination of a single competitor and not at protecting members from competition from other new entrants to the market.  Indeed, as the SAC alleges, the membership denials in 2022 and 2025 were a personal attack on Plaintiff Prossin to keep just him and his new company out of Antarctica.  See Taylor v. Gural, Civil Action No. 23-4882, 2025 WL 638596, at *20 (E.D. Pa. Feb. 27, 2025) (antitrust injury established because conduct affected not only claimants but also entire class of owners barred from participating in harness horse races at defendant's racetracks).

As to the alleged refusals to deal, the SAC pleads the existence of an agreement of IAATO to direct members to unilaterally refuse to deal with Plaintiffs based on nothing more

than "information and belief."  See e.g., ECF No. 65-2 ¶ 75.  For factual support, the SAC relies

only on parallel conduct and stray statements claiming an agreement, which were held

insufficient to nudge an antitrust claim past a motion to dismiss by Twombly, 550 U.S. at 570.

Nor does the SAC add facts to offset the equally (indeed more) plausible inference that One

Ocean's loss of two ships and bankruptcy may be a competitively neutral reason for suppliers'

refusals to deal with Plaintiff EE.  See Eastway Const. Corp. v. City of New York, 762 F.2d 243,

246, 250-51 (2d Cir. 1985) (even if agreed upon collectively, refusal to enter into new contracts

with entities whose principals had controlled entities that defaulted on loans "wholly fails to

make out a viable claim under the antitrust laws"), superseded on other grounds by Fed. R. Civ.

P. 11.  Thus, the SAC lacks facts consistent with a refusal to deal resulting in antitrust injury,

leaving a pleading consistent with the inference that the harm to Plaintiff EE results from the

rational decisions of suppliers to refuse to deal with Plaintiff Prossin's new entity in light of the

recent failure of One Ocean.  See Twombly, 550 U.S. at 554 (conduct that may be consistent with

conspiracy, "but just as much in line with a wide swath of rational and competitive business

strategy unilaterally prompted by common perceptions of the market" is insufficient to survive

Fed. R. Civ. P. 12(b)(6)); Hansen v. Northwestern Univ., No. 24 C 9667, 2025 WL 2731378, at

*8 (N.D. Ill. Sept. 24, 2025) (allegations of conduct just as consistent with wide range of lawful

and independent actions as with anticompetitive agreement fails to state antitrust claim).

Nor does the SAC contain any allegation of coercion by IAATO to enforce its alleged

decision to discourage members from making the unilateral decision to deal with Plaintiffs.  See

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 610-11 (1985) (for unilateral

refusal to deal to inflict antitrust injury, it must amount to election to forego short-term profits for

longer term elimination of competition); Reapers Hockey Assoc., Inc., 412 F. Supp. 3d at 954-57

(rules that limit competition to maintain balance among teams do not transgress antitrust laws; competitors may freely exercise discretion as to parties with whom to deal).  Nor is it violative of United States antitrust law for IAATO's pro-competitive focus on safety and protection of Antarctica's environment to result in encouragement (but not coercion) of IAATO members (which have been vetted pursuant to its standards) to do business with each other and not outsiders.  See Twombly, 550 U.S. at 564-67 (allegations of parallel decisions to resist competition not enough to imply antitrust conspiracy); Relevent Sports, LLC v. United States Soccer Fed'n, Inc., 61 F.4th 299, 309 (2d Cir. 2023) (antitrust claim survives motion to dismiss based on factual allegation of coercion in that national associations, leagues and teams have "surrendered [their] freedom of action . . . and agreed to abide by the will of the association") (internal quotation marks omitted) (alterations in original).

To buttress their antitrust claim, Plaintiffs ask the Court to rely on a pre-Twombly decision from the Eastern District of Texas, Golden Bridge Tech., Inc. v. Nokia, Inc., 416 F. Supp. 2d 525 (E.D. Tex. 2006).  In Golden Bridge, members of a trade association tasked with creating uniform telecommunications technology standards to ensure worldwide compatibility were sued by a competitor whose proprietary interface was eliminated from the standard after it began discussions concerning license agreements with other competitors.  Id. at 527-28.  The effect of this decision was to completely cut off Golden Bridge's access to the market necessary for it to compete in what the court found was a classic per se group boycott or concerted refusal to deal in violation of § 1 of the Sherman Act.  Id. at 530.  There are three problems with Plaintiffs' reliance on Golden Bridge: first, the conduct at issue in Golden Bridge was not targeted at a single competitor (Golden Bridge), but at eliminating competition with the technology it was selling; second, in Golden Bridge, the effect of the conduct was the complete

elimination of consumers' ability to choose the technology in issue, not merely a competitive disadvantage imposed on sellers of the technology; and third, a pre-<u>Twombly</u> decision, <u>Golden Bridge</u> does not consider the plausibility of the claim of antitrust injury in that it relies on the now denigrated (as applied to alleged group boycotts, especially by trade associations) *per se* rule and is silent on how competition was affected, apart from the elimination of one category of interface.  For these reasons, <u>Golden Bridge</u> does not alter my recommendation.

Plaintiffs' summary of the SAC on reply (ECF No. 71 at 3) encapsulates the problem. That is, IAATO may well be "ripe for abuse" as a standard setting organization whose membership acts as a seal of legitimacy for participants in a market where the safety and comfort of passengers traveling to the dangerous and vulnerable environment of Antarctica is understandably critical for the very existence of the market.  However, the mere possibility of abuse does not afford support for a plausible claim that IAATO and its members have violated the Sherman Act by conduct that has injured <u>not just Plaintiff EE</u>, but also has harmed competition resulting in raised prices and/or decreased output in this highly competitive market. Plaintiffs still fail to allege what impact their exclusion from IAATO and their difficulties in persuading Antarctica-experienced employees, tour referral sources, ship brokers and ship charterers to deal with Plaintiff EE in the aftermath of One Ocean's bankruptcy has had or could have had on price, output, or the quality of Antarctica boat tour services in a competitive worldwide market.  Like the earlier pleading, the SAC remains laser-focused on Plaintiffs' own struggles to compete, which is not a market-wide injury and, without more, not redressable through antitrust enforcement.  <u>See</u> <u>Brooke Grp. Ltd.</u>, 509 U.S. at 224 (Sherman Act protects "<u>competition</u>, not <u>competitors</u>") (internal quotation marks omitted).  In short, while the SAC plausibly alleges business torts (defamation and tortious interference with advantageous

23

relations) that may have caused "impairments to . . . one market actor" – Plaintiff EE – it still lacks facts to plausibly establish conduct that adversely impacts the competitiveness of this highly competitive market. <u>Sterling Merchandising, Inc.</u>, 656 F.3d at 122.

Because the SAC still fails plausibly to allege antitrust injury, I recommend that the motion to amend to add the antitrust claims in Counts 1 and 2 be denied as futile.

## VII.    Conclusion

Based on the foregoing, pursuant to Fed. R. Civ. P. 15(a), I recommend that Plaintiffs' motion for leave to file the SAC (ECF No. 65) be DENIED in part and GRANTED in part. Based on the futility of the amendment to add Counts 1 and 2, I recommend that the Court find that Counts 1 and 2 still fail plausibly to plead an injury redressable through antitrust enforcement and, to that extent, the motion to amend should be denied.  Further, and only if the Court does not adopt this recommendation, based on the SAC's admitted failure to plead that Plaintiffs' antitrust injury is derived from FTAIA's required effect on United States domestic commerce, I recommend that the dismissal of Counts 1 and 2 be accompanied by leave to file another motion to amend.[18]  Otherwise, I recommend that the Court decline to afford Plaintiffs leave to file yet another motion to amend.

Also based on the futility of the amendment, as well as on Plaintiffs' abandonment of the claims as represented in their brief and during the hearing (n.2 *supra*), I recommend that the Court find that Plaintiffs' claim of tortious interference with contract in Count 5 and defamation claims (Counts 3 and 4) against Defendants IAATO, Woodhead and Haase still fail to state plausible claims and, to that extent, the motion to amend should be denied.

---

[18] As noted *supra* n.10, I express no position "at this time on whether such a motion will be granted."  <u>Prossin</u>, 2024 WL 3850360, at *5.

As to the balance of the SAC,[19] I recommend that the motion to amend be granted.

Any objections to this Report and Recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen days of service of this Report and Recommendation.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See Brenner v. Williams-Sonoma, Inc., 867 F.3d 294, 297 n.7 (1st Cir. 2017); Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
December 30, 2025

---

[19] If the Court adopts my recommendations, the claims in the SAC that would still be pending are Count 5's claim of tortious interference with business advantage against all Defendants and Counts 3 & 4's defamation claims against Defendants Cheeseman, Ecological Safari, Ship to Shore, Inc. and Betts.